## APPEAL OF CANTON BRIDGE CO.

Docket Nos. 2633 and 3523.   Submitted June 15, 1925.   Decided October 30, 1925.

> The taxpayer was organized in 1907, taking over all the property of a predecessor company with identical stockholders, and issuing therefor $250,000 of bonds payable on demand and $25,000 of stock. The bonds were secured by mortgages and the object of the reorganization was to defeat certain contingent judgment creditors. Thereafter, the bonds were never treated as a liability by the corporation nor by its stockholders who held them in proportions identical with their holdings of stock. *Held*, upon the evidence, that the assets paid in upon the organization of the taxpayer for $250,000 of bonds actually issued represented a paid-in surplus of the taxpayer for the purpose of computing invested capital.

*William Simpson* and *Atlee Pomerene, Esqs.*, for the taxpayer.
*E. C. Lake, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

These are appeals from determinations of deficiencies in income and profits taxes for the fiscal years ended February 28, 1918, and February 28, 1919, respectively, in the amounts of $10,427.56 and $31,817.98. The issues are substantially identical in both appeals.

. FINDINGS OF FACT.

The taxpayer is a New Jersey corporation with its principal office and place of business at Canton, Ohio.

In or about the year 1905 the Canton Bridge Co. of Ohio was engaged in business in that State constructing bridges on contracts with public authorities for the most part in the State of Ohio. At that time litigation arose whereby certain taxpayers brought suits against numerous bridge companies, of which the Canton Bridge Co. of Ohio was one, for the recovery of money paid by certain counties, on the ground that county officers' certificates for the payment of the amounts due on such contracts had not been properly made.

It appearing that the Ohio corporation would suffer serious financial loss if the taxpayers in these actions prevailed and judgments were recovered on account of the funds thus received on bridge contracts, the Canton Bridge Co. of Ohio, on advice of counsel, transferred all its property and assets to a corporation organized under the same name but under the laws of West Virginia. The stockholders of the Canton Bridge Co. of Ohio and the Canton Bridge Co. of West Virginia were identical.

Thereafter the stockholders of the West Virginia company were advised by New York counsel that the transfer of the property from the Canton Bridge Co. of Ohio to the Canton Bridge Co. of West Virginia was ineffective for the purpose of avoiding execution upon any judgments which might be secured against the Canton Bridge Co. of Ohio, and again, on advice of counsel, the stockholders caused to be organized the Canton Bridge Co. of New Jersey, the taxpayer herein, and caused to be transferred to it all of the property and assets of the Canton Bridge Co. of West Virginia in exchange for $250,000 in cash. The Canton Bridge Co. of New Jersey acquired the cash wherewith to pay the Canton Bridge Co. of West Virginia in the following manner: First, capital stock was subscribed and paid for with $25,000 cash; second, bonds of the taxpayer were issued of a face value of $250,000, being sold at 90 per cent of face value for $225,000.

The actual subscribers to the capital stock and bonds of the taxpayer were the prior stockholders of the Canton Bridge Co. of Ohio and the then stockholders of the Canton Bridge Co. of West Virginia,.

acting, however, through dummies who were employees of said stockholders either in the Canton Bridge Co. or other enterprises owned or controlled by them. The bonds issued by the taxpayer were first mortgage bonds secured by a deed of trust in due form. The effect of this transaction was to place upon the previous assets of the Canton Bridge Co. of Ohio a lien, legal on its face, and prior to any judgments which might thereafter be rendered against the Canton Bridge Co. of Ohio.

Upon the books of account of the Canton Bridge Co. of West Virginia and the taxpayer, the foregoing transaction was entered to indicate that all of the steps above outlined had been taken and cash had actually passed from the taxpayer to the Canton Bridge Co. of West Virginia. Thereupon, the Canton Bridge Co. of West Virginia declared a dissolution dividend of 100 per cent upon its outstanding capital stock of $250,000. It was not dissolved, however, but its corporate organization was retained with a reduced capitalization of $12,500 for the purpose of taking contracts in those States in which it was at that time authorized to do business. Its stock continued to be held or controlled in effect either by the taxpayer or by its stockholders.

In like manner, a certain corporation known as the Central Concrete Construction Co., with a capital stock of $500, was organized to take contracts for the construction of bridges in the State of Ohio and was used for that purpose, the stock of that company also being owned or controlled by the taxpayer or by its stockholders.

The bonds above mentioned of a par value of $250,000 were actually delivered to and continuously held by the prior stockholders of the Canton Bridge Co. of Ohio, except as hereinafter set forth. They were issued payable on demand, but in fact no demand was ever made for their payment and no interest was ever paid thereon. No interest was ever accrued thereon upon the books of the taxpayer, and no bonds were ever retired, except as hereinafter set forth, except that four bonds were delivered to the company in 1908 when a certain piece of real property was sold and it was necessary to release that property from the mortgage. The price at which such property was sold was $3,500 and, although four bonds were surrendered, the bond account was left upon the books at $246,500, being the original amount of $250,000 less the $3,500 consideration actually received and retained by the company for the property actually sold.

Subsequently the litigation which originally gave rise to the transactions above outlined was terminated in effect favorably to the bridge companies in or about the year 1907, by a decision of the Supreme Court of Ohio, reported in 77 Ohio St. 7.

From the date of the issue of the said bonds until April 7, 1914, no demand was made on the taxpayer for the payment of either principal or interest thereon, no interest was accrued on the books of the taxpayer, and they were at no time treated as existing among its liabilities other than the continuance of the accounts upon its books in which they appeared.

On April 7, 1914, the owners in fact of all the stock of the taxpayer, of the Canton Bridge Co. of West Virginia, and of the Central Concrete Construction Co., Ben and Jay Conger, entered into an agreement with William C. Laiblin, wherein they agreed to sell and he agreed to buy all the capital stock of the taxpayer, the first mortgage bonds above mentioned of the taxpayer, and all the capital stock of the Canton Bridge Co. of West Virginia. Under this agreement, Laiblin undertook to pay $1,000 on its execution, $24,000 on or before April 10, 1914, and $25,000 in each of the years 1915 to 1922, inclusive.

Upon the payment of the first $25,000 specified in the contract by Laiblin to Ben Conger and Jay Conger, the capital stock of the taxpayer and the West Virginia company was delivered to him, and in conformity with the terms of the contract, the Congers retained the bonds of the taxpayer, and Laiblin duly made, in the years 1915 to 1918, payments required on account of the said purchase price. The Congers did not, however, deliver up the bonds to Laiblin from time to time as required by the contract, but some of the said bonds were placed in a satchel and delivered to the trustee under the original indenture and others in the amount of approximately $65,000 were retained by the Congers.

The said contract with Laiblin further provided, as to the deferred payments, that interest should be paid thereon at a rate of 6 per cent, but nothing was provided in respect of the interest falling due annually upon the bonds withheld by the Congers. Throughout the period from 1914 to 1918 no interest was demanded or paid upon the said bonds, and none was accrued upon the books of the taxpayer.

During 1918, Laiblin, desiring to retire all the then outstanding indebtedness upon the purchase price of the stock and bonds, tendered the balance of the purchase price, but the Congers were unable to find and deliver the outstanding bonds, and Laiblin thereupon deposited with the trustee equivalent security upon the understanding that when the bonds were found they would be surrendered to the trustee and the mortgage would be satisfied and canceled.

On April 25, 1914, Laiblin entered into a contract with certain of the employees of the Canton Bridge Co., namely, H. Zurcher, G. C. Hiner, John Myers, Edward Johnson, and one Miller, for the sale to

them on identical contracts of 32 shares in all of the 250 shares of the stock of the taxpayer, at a price of $800 per share, and Laiblin in that contract agreed on or before the termination· of said contract of purchase to turn over to the purchaser of the said stock a pro rata share of $246,500 face value of bonds or cause the said bonds to be canceled and the mortgage satisfied.

Thereafter, and on March 23, 1921, Laiblin agreed to sell to Hiner and Zurcher, above mentioned, his remaining stock in the Canton Bridge Co.—217 shares, 1 share being withheld to qualify him as a director—at a price of $113,693.82, and upon terms for deferred payment not here material. The bonds above mentioned and still outstanding of record, as originally issued by the taxpayer, with the exception of $3,500, were not mentioned in this contract.

In or about April, 1922, Laiblin insisted that the outstanding bonds of the taxpayer not theretofore found be located and surrendered to the trustee and that the mortgage indebtedness of record be canceled. He was at all times between 1918 and 1922 ready and able to pay his indebtedness and had in fact deposited with the trustee collateral sufficient for that purpose. At that time Fred W. Clifford, an attorney of Owego, N. Y., who had from time to time represented the Congers in various matters and who in this matter represented Laiblin, insisted that a search be made and finally succeeded in locating the missing bonds. They were then surrendered and the mortgage canceled of record. At no time prior thereto nor at that time was any demand made on account of interest upon said bonds; none was ever paid and none was accrued upon the books of the taxpayer.

Thereafter, the Commissioner determined the deficiency hereinabove set forth, and in said determination did not allow as invested capital any portion of the $250,000 assets paid in for alleged bonds of the taxpayer. He furthermore did not allow consolidation of the taxpayer with the Canton Bridge Co. of West Virginia and the Central Concrete Construction Co. of Ohio, nor did he include the capital stock of the said companies in computing the invested capital of the taxpayer.

In the said computation of the deficiency, the Commissioner excluded from invested capital for the year ended February 28, 1918, an amount of $25,118.15, on account of a dividend declared March 21, 1917, and in the said computation made a computation of a tentative tax whereby he decreased the earnings available for the said dividend as of the said date and for the fiscal year ended February 28, 1919, the Commissioner excluded from invested capital $52,817.77 on account of a dividend paid May 8, 1918, and in the computation of that deduction determined a tentative tax to compute the earnings of the year available for the said dividend.

### DECISION.

The deficiency should be computed in accordance with the foregoing findings of fact and the following opinion. Final determination will be settled on consent or on 10 days' notice, in accordance with Rule 50.

### OPINION.

JAMES: The computation of the foregoing deficiency should be corrected in accordance with the decision of the Board in the *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135, in respect of both of the years under consideration.

Upon the taxpayer's claim that consolidation of three companies should be had, namely, Canton Bridge Co. of West Virginia and the Central Concrete Construction Co., we are of the opinion that the companies were affiliated since the stock was owned by the same parties, but there is no evidence to show that there was any invested capital attributable to the companies, but, on the contrary, the evidence shows that all the assets of the West Virginia company were taken over by the New Jersey company at the time the mortgage was given and all the investment therein distributed, and there is no evidence that any invested capital was ever paid in to the Central Concrete Construction Co. It further appears that the entire surplus of these companies, if any, was included in the computations of invested capital, since no separate books were kept for these companies during, or for many years prior to, the taxable years.

The main issue before the Board is whether the assets paid in on the organization of the taxpayer for $250,000 of bonds actually issued by the taxpayer in 1906 shall be treated as invested capital notwithstanding the fact that the bonds were outstanding of record throughout the period here in question. The taxpayer contends that they never had any valid existence from the beginning, that they were a fraud upon contingent judgment creditors when issued and were subject to be set aside by those creditors had the original suits in Ohio ripened into valid and enforceable judgments. With the legal principle advanced by the taxpayer we are quite in agreement, but we can not concede that it has the effect for which it contends. As to all the world except judgment creditors under the suits pending at the time these bonds were issued, they were a valid obligation solemnly entered into, and every step was taken which possibly could be taken to establish their validity. The mortgage was at all times of record and notice to the world of the existence of the obligation, but the conduct of the Congers at all times subsequent to the conclusion of the litigation in Ohio was such as conclusively to negative the existence in fact of these bonds as an obligation of the taxpayer. No interest was ever paid or accrued upon them. They were

ignored in bank statements. They were ignored in returns for capi- tal stock tax purposes. They were recognized only in the Laiblin contract and then only as a convenient means of dividing the security for the payments which he agreed to make. They were held at all times by the stockholders of the taxpayer in the proportions of their stock holdings. When Laiblin made his contract of purchase he delivered to the Congers notes bearing 6 per cent interest permitting the retention by them of the bonds as collateral. He paid interest on the notes. If the bonds had been regarded in any sense as an outstanding obligation of the taxpayer, the manner of handling this transaction would have been for the Congers to have collected the interest from the bonds and to have surrendered them to Laiblin pro rata as he made his payments and the contract naturally would have been drawn to provide for the purchase of the bonds in blocks of $25,000 and their surrender to him as purchased. Moreover, Laiblin's simultaneous contract with the other employees and his later contract with two of them whereby he sold all of his stock are wholly inconsistent with the view that these bonds then constituted a valid and existing obligation of the taxpayer. He sold the stock at a price representing the then estimated net worth, ignoring the bonds, and he merely agreed in one contract to secure their cancellation and altogether omitted in the other to mention them, although at that time they had not been canceled nor the mortgage satisfied.

It is quite clear from all the evidence that the Congers and all others connected with this enterprise regarded their invested capital from the organization of the taxpayer as $250,000 in substance, and that the purported debt represented by the bond and mortgage was nothing more than a fiction which they omitted to cancel because it made no difference to any of them. So little heed was paid to it that when Laiblin had completed all his payments or was prepared to complete his payments on account of his purchase of the business, the Congers were unable to locate all of the bonds. The Congers were, as the evidence shows, men of substance and of business experience, who would not be expected to treat valuable papers as the evidence shows the bonds were treated in this case. Nearly $200,000 of face value in one instance were delivered in a satchel to the trustee under the mortgage with no instructions as to their disposition and were thrown carelessly into an unused vault. The remainder were scattered through the offices of the Congers and were discovered only after a prolonged search. We are of the opinion that, whatever validity the bonds had upon execution and issue, and whatever validity may be attached to the original execution of the mortgage and deed of trust, it was the intent of the Congers at all times after 1907 to treat the assets secured by the bonds and the mortgage as in fact contributed to the invested capital of the taxpayer. As such.

and being in the hands of the sole stockholders, the assets purporting to be subject to these obligations constituted a paid-in surplus of the taxpayer and the obligations did not represent borrowed capital.

Significant of this intention is the surrender and cancellation of four of the bonds in 1908, when it was necessary to secure the release from the mortgage of a small piece of property sold by the taxpayer. Four bonds were delivered up to the trustee for cancellation, although the sale price of the property in question was only $3,500 and the $3,500 was actually paid to and retained by the taxpayer, no part of it being paid to the Congers in consideration of the release of the mortgage. This does not comport with the ordinary position of bondholders or mortgagees in connection with the release of any portion of their security in connection with a partial sale thereof by the mortgagor.

The deficiency should be redetermined in accordance with the foregoing.